**Michelle A. PATTON, Petitioner,**

v.

**Vannie TOY, Warden; and the Attorney General of South Carolina, Respondents.**

**Civ. A. No. 3:93–71–8AK.**

United States District Court, D. South Carolina, Columbia Division.

Oct. 27, 1994.

---

John H. Blume, Columbia, SC, for petitioner.

Donald J. Zelenka, Columbia, SC, for respondents.

## ORDER

BLATT, District Judge.

The petitioner in this case is seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. The record herein reveals that the petitioner is currently confined at the Women's Correctional Center of the South Carolina Department of Corrections pursuant to orders of commitment of the Clerk of Court for York County, South Carolina. A juvenile petition was brought on August 20, 1980, charging the petitioner with murder and armed robbery.[1] On August 21, 1980, a request to transfer the case to the Court of General Sessions was filed with the Family Court of York County. On August 25, 1980, a hearing was held before Judge Samuel Mendenhall, Family Court Judge of the Sixteenth Judicial Circuit, who ordered that the

---

**1.** The petitioner was born on August 14, 1965, and was 15 years old at the time of the offense.

murder charge be transferred to the York County Court of General Sessions.[2]

On October 27, 1980, the petitioner proceeded to trial in the Court of General Sessions before the Honorable C. Anthony Harris and a jury. She was represented there by James Hancock, Jr., and Frank Wells, of the York County Bar. She was found guilty of murder and, subsequently, sentenced by Judge Harris to confinement in the Department of Juvenile Corrections until her 21st birthday, thereafter to be committed to the State Department of Corrections for service for the remainder of her life.

The petitioner filed a timely notice of intent to appeal that sentence. After full briefing, the South Carolina Supreme Court affirmed the conviction and sentence pursuant to Rule 23 of the Rules of Practice of that court, finding no error of law present. *State v. Michelle Patton*, Mem.Op. No. 82–MO–43 (filed February 8, 1982). On appeal, the petitioner was represented by Tara D. Shurling of the South Carolina Office of Appellate Defense. The issue hereinafter decided by this court was raised and briefed in that appeal, but the Rule 23 dismissal sheds no light on the grounds on which this issue was decided. On April 8, 1988, more than six years after her direct appeal was denied, petitioner filed an application for post-conviction relief. The respondents filed their return on May 20, 1988, and an evidentiary hearing was held on January 31, 1989, at which the petitioner was represented by John P. Gettys of the York County Bar. In her application, as amended, the petitioner raised the following claim:

> Ineffective assistance of counsel in that John W. Hancock did not have the necessary experience to represent me in a capital murder case.

Judge Harris entered an order on March 21, 1989, denying the PCR application in its entirety, concluding that the petitioner had failed to satisfy her burden of proof in showing any state law violation, and further that James F. Wells, one of petitioner's counsel, had in excess of five years of criminal law experience. No appeal was taken from that order, which also concluded that counsels' performance was not deficient, nor was the petitioner prejudiced in any way by her attorneys' performance under the standards recognized in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

On April 9, 1990, the petitioner filed a petition in this Court for writ of habeas corpus pursuant to 28 U.S.C. § 2254. *Patton v. Evatt, et al.*, Civil Action No. 3:90–751–8K. The respondents filed a return and motion for summary judgment on March 15, 1990; subsequently, the petitioner filed a motion to dismiss without prejudice. On November 13, 1990, this court entered an order dismissing the matter without prejudice.

The petitioner filed the habeas petition currently before the court on January 13, 1993. The respondents filed a return and motion for summary judgment on April 29, 1993. The record herein includes the report and recommendation of United States Magistrate Judge William M. Catoe in which report he recommends that the respondents' motion for summary judgment be granted and that this case be dismissed. The petitioner was given notice of the right to file objections to that report and recommendation, and of the consequences for a failure to do so; in response, the petitioner filed objections with the court in which she requested that counsel be appointed for her. Petitioner stated, in her response, that John Blume, Esquire, of the South Carolina Death Penalty Resource Center, had indicated to her that he might be willing to assist the petitioner with her case. This court contacted Mr. Blume who advised the court that he would assist petitioner if he was appointed. This court then appointed Mr. Blume as counsel for the petitioner and he filed a reply on August 12, 1994, to the respondents' motion for summary judgment.

The report and recommendation of the United States magistrate judge was made in accordance with 28 U.S.C. § 636 and the local rules of this district concerning refer-

---

**2.** Throughout this order, the terms Juvenile Court and Family Court are interchangeable. Names for these types of courts vary by state.

ence to a magistrate judge. *See United States Magistrates*, Local Rule 19, D.S.C.; *Social Security Cases*, Local Rule 20, D.S.C.; *Bowman v. Bordenkircher*, 522 F.2d 209 (4th Cir.1975). Under 28 U.S.C. § 636(b),

> [a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Here, the petitioner filed objections to the magistrate judge's report and the court has conducted a *de novo* review of those parts of the magistrate judge's report to which objections were received. No additional brief was received from the respondents.

The petitioner is currently confined at the Women's Correctional Center of the South Carolina Department of Corrections, where she is serving a life sentence. Her conviction arose out of a homicide which occurred at a Fast Fare convenience store in Tega Cay, South Carolina, on August 18, 1980. A young male cashier working there at night was shot and killed by petitioner's co-defendant, Wardell Patterson,[3] during the commission of an armed robbery. The petitioner was charged with murder under South Carolina's accomplice liability doctrine, commonly referred to as "the hand of one is the hand of all."[4] The other co-defendants were Freddie Lee Gordon and Jerleen Patterson Nelson.[5]

The petitioner filed four objections with the court. This court has chosen to rule on only one of those objections, while preserving petitioner's right to have her other objections reviewed at a later date should this court's order be reversed on appeal. In her third objection, the petitioner claims that her due process rights, protected by the sixth and fourteenth amendments, were violated in her waiver hearing from the Family Court to the Court of General Sessions. As heretofore set forth, on August 25, 1980, a waiver hearing was held in the York County Family Court before former Judge Samuel B. Mendenhall.[6] The hearing was held five days following the petitioner's arrest, and four days after the petition to waive jurisdiction of the Family Court was filed. The petitioner was represented by her court-appointed counsel, James W. Hancock, Jr.

Although not a basis for this courts' determination herein, this court begins by noting that petitioner's counsel, who had approximately one year's experience as an attorney, was given only four days to prepare for the hearing. No family members were present for the hearing. Counsel had requested a continuance based on a South Carolina statute which required more experienced counsel in a death penalty case, but the judge ruled against the petitioner because the State was not then seeking the death penalty, although unquestionably the death penalty could have been pursued at a later date. Petitioner's counsel did not present any testimony on behalf of the petitioner, and he cross-examined only one of the state's two witnesses.[7]

---

**3.** Patterson pled guilty to murder and armed robbery after the jury was selected but before the start of trial. He was initially sentenced to death in the penalty phase by the same jury which heard petitioner's case. His sentence was reversed on appeal, and he was subsequently sentenced to life imprisonment.

**4.** Under South Carolina law, "where two persons combine to commit an unlawful act, and in the execution of the criminal act, a homicide is committed by one of the actors as a probable or natural consequence of those acts [sic], all present participating in the unlawful act are as guilty as the one who committed the fatal act." *State v. Johnson*, 291 S.C. 127, 129, 352 S.E.2d 480, 482 (1987).

**5.** Freddie Lee Gordon was allowed to plead guilty to manslaughter and received a sentence of thirty years. Jerleen Patterson Nelson was found guilty of murder and armed robbery and received a life sentence.

**6.** Samuel B. Mendenhall was recently convicted in state court of a crime involving the abuse of his office while serving as an active Family Court Judge.

**7.** This court has decided that the petitioner's case can be decided on due process grounds; therefore, even though the petitioner may have a reasonable basis upon which to assert an ineffective assistance of counsel claim, this court does not now pass on that issue.

The hearing transcript is a sparse eleven pages and contains only 7–8 pages of testimony. Tr. pp. 7–14.

The first witness called by the State was Catherine Huskey, a counselor for the South Carolina Department of Juvenile Placement and Aftercare, who testified that she was familiar with the adjudication of the petitioner. She testified that one previous petition had been filed against the petitioner in the York County Family Court for a "truant situation" on December 17, 1979. As a result, the petitioner was ordered to be placed on indefinite probation. Huskey testified that at the time of the hearing, August 25, 1980, petitioner was not on probation. Petitioner's counsel did not cross-examine Huskey.

The second witness called by the State was Patricia W. Tolbert, an employee with the South Carolina Department of Youth Services/Rock Hill Youth Bureau in York County, who testified that she was familiar with petitioner and that petitioner had earlier been placed at the Wilkerson Girl's Home in Cayce, South Carolina. It is unclear from the record why the petitioner was placed in that home; however, since there had been only one previous petition filed against petitioner involving a charge of truancy, this court can only assume that she was placed in the home because of the truancy charge. Tolbert testified that petitioner was assigned to stay at that home for three to six months, but that she only stayed approximately one month because she left with another resident of the home. When asked if she knew why petitioner had left, Tolbert responded:

Michelle came home one weekend and returned to the group home and according to the director of the group home, one girl had entered the group home that was a strong influence, a strong girl, and led Michelle astray and the girl was terminated from the program and she got Michelle to go with her. Tr. p. 12.

The petitioner stayed at the other girl's home for approximately two and one-half weeks. Tolbert then testified that she and petitioner's mother went to the home at Cayce, South Carolina, on July 17, 1980. Although it is not stated clearly in the testimony, it appears that Tolbert and petitioner's mother went to Cayce to return the petitioner to her mother's home and that they were successful. From that point, Tolbert only knew that the petitioner was supposed to have been living with her mother. Tolbert then testified that she was familiar with the allegations against petitioner from reading the newspaper and from hearing people in town talking about the incident. She was then asked if she knew where petitioner was several days prior to "this" [8], to which Tolbert responded that petitioner's mother had told her that petitioner had left home Thursday before the murder, came back that Saturday morning and stayed for a short time, left and came back that Sunday morning, and then left again. Tolbert then testified that the petitioner's mother told Tolbert that she did not thereafter hear from petitioner. Stating that he was not familiar with the rule of evidence in this type of proceeding, petitioner's counsel objected to this testimony as being hearsay. The judge asked Tolbert to answer the question based on her determination, not based on what the mother had said, to which Tolbert responded: "Well, her mother was real upset and didn't really know what was going to happen to Michelle and she was feeling bad and basically, what I told her.... The mother had done everything she could. It's not a reflection on her. Michelle was just at the wrong place at the wrong time." Tr. p. 14. The judge then engaged in the following colloquy with Tolbert:

Q. So you think the mother had done everything she could to help her?

A. I think she had tried.

Q. Do you think anything has helped her?

A. The group home was working out real well if she had given it another chance.

Tr. p. 14.

On cross examination, petitioner's counsel asked Tolbert whether petitioner was doing well in the home, to which Tolbert responded that petitioner was doing real well the first couple of weeks she was there, and that the home felt she was making progress. He

8. It is unclear to what "this" has reference, but, it presumably indicates the murder.

then inquired about the girl who led petitioner astray, to which Tolbert responded that she felt like Michelle was doing real well until this girl came into the home. Tolbert testified that the girl was much stronger than Michelle and that Michelle just followed her. Tolbert also stated: "Michelle is a follower, a submissive-type person. A much stronger person can easily lead her" and that it was her opinion that Michelle was still of that nature at the time of the waiver hearing. Petitioner's counsel asked Tolbert if petitioner could be easily led by those older and wiser than she, and Tolbert responded that the petitioner could be easily led by older persons, and that petitioner placed great confidence in the opinions and actions of older people.

Petitioner's counsel then made a final argument to the judge that the petitioner was only fifteen, easily led, was in the wrong place at the wrong time, and was, at the time of the murder, with older people, whose ages were 25, 21 and 22. The solicitor argued the case should be transferred because of the severity of the offense and the nature of petitioner's past acts. The judge then decided that he would grant the motion to transfer stating: "Now, Michelle has been in this court. I think the juvenile corrections has done all it can do to help this child and the best interest of the community would- be served by her transfer." Tr. p. 18.

The Family Court issued an order dated August 25, 1980, which, in part, stated:

"After studying the record and hearing the testimony of a representative of the Department of Youth Services as to the child's incorrigibility and a representative of Juvenile Placement and Aftercare as to the child's truancy, I have determined that the murder case should be transferred to the Court of General Sessions due to the fact that it would be contrary to the best interest of the public for this court to retain jurisdiction. I also find from the record and all the testimony that this child could not be rehabilitated by this court." (This order is contained in the Addendum to Transcript p. 1.)

Prior to 1966, decisions to transfer a juvenile for prosecution as an adult were made with little formality. This changed in 1966 when *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966) was decided. In 1961, Morris Kent, then sixteen years old, was charged in the Juvenile Court in Washington, D.C., with crimes arising out of a series of incidents in which he broke into a number of women's homes and robbed and raped them. Kent was already under the supervision of the Juvenile Court for several prior housebreakings and an attempted purse snatching. Without holding any hearings, the Juvenile Court Judge entered an order simply stating that "after full investigation, I do hereby waive jurisdiction of petitioner." *Id.* at 546, 86 S.Ct. at 1049. The order directed that Kent be held for trial on the criminal charges in the United States District Court in the District of Columbia. Subsequently, Kent was convicted on six counts of housebreaking and robbery. He was found not guilty by reason of insanity on the rape counts. In the United States Supreme Court, Kent challenged, on a number of statutory and constitutional grounds, the proceedings by which the Juvenile Court waived its otherwise exclusive jurisdiction. He contended that the waiver was defective because no hearing was held, no findings were made by the Juvenile Court, no reasons for the waiver were stated, and his counsel was denied access to the Social Services file, which file was, presumably, considered by the Juvenile Court in determining to waive jurisdiction. The Supreme Court held that Kent's waiver was invalid. The Court concluded: "The [waiver] statute does not permit the Juvenile Court to determine in isolation and without the participation or any representation of the child the 'critically important' question whether a child will be deprived of the special protections and provisions of the Juvenile Court Act." *Kent* at 553, 86 S.Ct. at 1053.

Further, the Court stated:

It is clear beyond dispute that the waiver of jurisdiction is a 'critically important' action determining vitally important statutory rights of the juvenile.... The statutory scheme makes this plain. The Juvenile Court is vested with 'original and exclusive jurisdiction' of the child.... The net,

therefore, is that petitioner—then a boy of 16—was by statute entitled to certain procedures and benefits as a consequence of his statutory right to the 'exclusive' jurisdiction of the Juvenile Court. In these circumstances ... we conclude that, as a condition to a valid waiver order, petitioner is entitled to a hearing, including access by his counsel to the social records and probation or similar reports which presumably are considered by the court, and to a statement of reasons for the Juvenile Court decision. We believe that this result is required by the statute read in the context of constitutional principles relating to due process and the assistance of counsel. *Kent* at 556–57, 86 S.Ct. at 1055.

█ The Supreme Court directed that, prior to transfer, a hearing must be held in which certain rights are afforded to a juvenile. In an appendix to its opinion in *Kent,* the Supreme Court quoted, with approval, a District of Columbia policy memorandum which recited eight factors to be considered by the Juvenile Court in making a transfer decision. Although the Supreme Court did not explicitly hold that these factors must be followed by lower courts, this court believes that these factors provide excellent general guidance. The eight factors are stated as follows:

1. The seriousness of the alleged offense to the community and whether the protection of the community requires waiver.

2. Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner.

3. Whether the alleged offense was against persons or against property, greater weight being given to offenses against persons especially if personal injury resulted.

4. The prosecutive merit of the complaint, i.e., whether there is evidence upon which a Grand Jury may be expected to return an indictment (to be determined by consultation with the United States Attorney).

5. The desirability of trial and disposition of the entire offense in one court when the juvenile's associates in the alleged offense are adults who will be charged with a crime in the U.S. District Court for the District of Columbia.

6. The sophistication and maturity of the juvenile as determined by consideration of his home, environmental situation, emotional attitude and pattern of living.

7. The record and previous history of the juvenile, including previous contacts with the Youth Aid Division, other law enforcement agencies, juvenile courts and other jurisdictions, prior periods of probation to this Court, or prior commitments to juvenile institutions.

8. The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile (if he is found to have committed the alleged offense) by the use of procedures, services and facilities currently available to the Juvenile Court.

█ The *Kent* court held that our judicial system could not allow a result of such tremendous consequences, namely, a transfer of jurisdiction by the Juvenile Court, to be reached without ceremony, without hearing, without effective assistance of counsel, and without a statement of reasons. While the Supreme Court in *Kent* was considering the juvenile transfer statutes of the District of Columbia, this court must consider very similar South Carolina provisions found in S.C.Code Title 14, Chapter 2.[9] § 14–21–540, entitled "Transfer of certain criminal cases from Family Court to other courts", which reads, as follows:

If a child sixteen years of age or older is charged with an offense which would be a misdemeanor or felony if committed by an adult, and if the court, *after full investigation,* deems it contrary to the best interests of such child or of the public to retain

---

9. S.C.Code § 14–21–560 was in effect at the time of petitioner's hearing. It was repealed in 1981 and replaced by § 20–7–740. For purposes of the analysis of petitioner's claim, all South Carolina code references will be to sections which were in effect at the time of petitioner's hearing. All of the sections have been repealed and replaced by Title 20, Chapter 7, which is entitled "The South Carolina Children's Code."

jurisdiction, the court may, in its discretion, acting as committing magistrate, bind over such child for proper criminal proceedings to any court which would have trial jurisdiction of such offense if committed by an adult. (emphasis added).

This section is similar to the District of Columbia statute in *Kent* because it contains the phrase "after full investigation." The United States Supreme Court held that this type of statute contemplates that the Juvenile or Family Court have considerable latitude within which to determine whether it should retain or transfer jurisdiction; however, the Supreme Court held that this latitude is not without bounds, because it assumes procedural regularity sufficient, in the particular circumstances, to satisfy the basic requirements of due process and fairness, as well as compliance with the statutory requirement of a "full investigation." *Kent* at p. 552, 86 S.Ct. at 1053. Since the Supreme Court held that juvenile proceedings are civil rather than criminal, the Juvenile Court making a transfer decision is theoretically engaged in determining the needs of the child and of society, rather than adjudicating criminal conduct, with the primary objectives being to provide measures of guidance and rehabilitation for the child and protection for society, not to fix criminal responsibility. *Id.*

■ The Supreme Court recognized that the waiver hearing in *Kent* was as potentially important to the juvenile as was the difference between five years' confinement and the death sentence that Kent was facing.[10] Here, although the petitioner received a life sentence, at the time of the waiver hearing the State had not decided whether it would pursue the death penalty, so petitioner's hearing was equally as important as the hearing in *Kent*. This court recognizes that the hearing deficiencies in *Kent* were more egregious than the situation here; however, this court finds that petitioner's hearing did

not comport with the requirements of due process or fundamental fairness.

S.C.Code § 14–21–560 in part reads:

... Prior to the hearing of a case of any child, the judge shall cause an investigation of all the facts pertaining to the issue to be made. Such investigation shall consist of an examination of the parentage and surroundings of the child, his age, habits and history, and shall include also any inquiry into the home conditions, habits and character of his parents or guardian, if such is necessary in the discretion of the court. In such cases the court shall also, if advisable, cause the child to be examined as to his mentality by a competent and experienced psychologist or psychiatrist who shall make a report of his findings. Prior to the hearing in the case of any child, if such child attends school, there shall be obtained from the school which he attends a report concerning him.[11]

The *Kent* court held that in order for a reviewing court to conduct a meaningful review, it must have before it a statement of the reasons motivating the waiver including, of course, a statement of the relevant facts. The statement must be sufficient to demonstrate that the statutory requirement of a "full investigation" has been met, that the question has received the careful consideration of the Juvenile Court, and it must detail the basis for the order with sufficient specificity to permit meaningful review. *Kent* at 560–62, 86 S.Ct. at 1057. A reviewing court may not "assume" that there are adequate reasons, nor may it merely assume that a "full investigation" has been made. *Id.*

■ Juvenile waiver hearings must measure up to the essentials of due process and fair treatment. *Application of Gault*, 387 U.S. 1, 30, 87 S.Ct. 1428, 1445, 18 L.Ed.2d 527 (1967) (quoting from *Kent v. United States*, 383 U.S. 541, 560–62, 86 S.Ct. 1045, 1057, 16 L.Ed.2d 84 (1966). "*Kent* and *Gault* make it unquestionably clear that Juvenile Court proceedings that affect a young per-

---

10. The five years referred to is the time period that Kent would have served if the Juvenile Court had held that it had proper jurisdiction. Kent would have been committed at the age of 16 and released at the age of 21.

11. The South Carolina Supreme Court has held that the investigation requirements of § 14–21–560 are applicable to a transfer hearing under § 14–21–540. *In the Interest of Shaw*, 274 S.C. 534, 265 S.E.2d 522, 526 (1980).

son's substantial rights must measure up to the essentials of due process and fair treatment." *Kemplen v. Maryland,* 428 F.2d 169, 172 (4th Cir.1970).

■ As stated earlier, in *Kent* the Court held that, in order for a court to undertake a meaningful review of a transfer of jurisdiction by a Juvenile Court, the reviewing court should have before it a statement of the reasons motivating the waiver, including a statement of the relevant facts. The statement of reasons must demonstrate that the statutory requirement of a "full investigation" has been met and must set forth the basis of the order with sufficient specificity. The statement must show that the question received careful consideration from the Family Court. Upon review of the sparse transcript of the hearing and the general nature of the judge's order here, this court finds that the record does not reveal that the Family Court carefully considered the matter. As to petitioner's past conduct, the record before this court indicates only one prior truancy charge and that petitioner had left a girl's home to which she had been assigned. The Family Court judge did not specifically cite this prior conduct in his order. It is not sufficient for a judge merely to state, in such a critical order, that he or she finds from the record and all the testimony that a child cannot be rehabilitated. The order must set forth very specific reasons why the judge feels that a child cannot be rehabilitated, at least sufficiently specific for a reviewing court to undertake a meaningful review. The order here is totally lacking in any degree of specificity which would allow this court to undertake a meaningful review. The record here reveals only that petitioner was a submissive child who would benefit from rehabilitation, if she would give it another chance, e.g., Tolbert testified that the group home "was working out real well if she [petitioner] would give it another chance." Tr. p. 14. The child was not even on probation at the time of the hearing; in fact, Tolbert testified that petitioner was in the wrong place at the wrong time.

Additionally, this court finds that the Family Court record clearly indicates that there was no "full investigation" as required by both South Carolina statutory and federal constitutional law. There are no records concerning the child's parents, her home conditions, her mental maturity, or her attitude, all of which are needed to determine whether or not she could be rehabilitated. The entire history this court has before it is listed on a document entitled "Social Summary Narrative", which is apparently part of a set of "Intake" documents utilized by the Department of Juvenile Placement and Aftercare. The narrative consists of one paragraph:

> Michelle was in regular classes at Rawlinson Rd. Jr. High School but now is in Alternative School. She has a history of truancy and is not doing to well in her class work. She has 1 older sister, 2 younger brothers and 1 younger sister. Mrs. Patton is a cook at the Ramada Inn in Rock Hill, S.C. from 5:30 a.m. until 2:00 p.m. To reach the family by phone, call 327–9802, Clemons Funeral Home.

Based on the record herein, this court cannot undertake a "meaningful review" of the waiver hearing afforded petitioner and it concludes that the petitioner did not receive the required due process, because there is no stated basis upon which the Family Court Judge determined that petitioner could not have been rehabilitated.[12]

■ Based on these findings, it is

ORDERED, that petitioner is entitled to the relief sought herein, and the defendants

---

12. This court encourages Family Court Judges in South Carolina to apply the principles of the *Kent* case when making the decision of whether to transfer a child to adult court. With the increased participation of juveniles in more serious crimes, the Family Court Judges will be called upon to make even more transfer decisions, and the *Kent* case will provide excellent guidance in assisting the Family Court Judges to present records which a reviewing court can consider in a meaningful manner. With the on- set of more of these cases, the burden on Family Court judges will be even greater, but it must be remembered that the objective of the Family Court is to provide measures of guidance and rehabilitation for the child and to protect society, not to fix criminal responsibility, guilt or punishment. Each child is entitled to due process before a transfer to adult court, and any reviewing court must ensure that each child receives such process.

are directed to promptly terminate her imprisonment.[13]

IT IS FURTHER ORDERED, that petitioner's release is stayed under the terms of this order during the time period in which the defendants may file a notice of appeal.[14]

**IT IS SO ORDERED.**

---

**13.** The Supreme Court in *Kent* did not order his release, but instead remanded the case to the District Court for a hearing *de novo* on the waiver issue consistent with their opinion. The Supreme Court did not order the release of Kent because of the peculiar circumstances of that case. In footnote 33, the Court mentioned that Kent was in a hospital for psychiatric treatment at the time the opinion was rendered. This court notes that although release is not always appropriate in a habeas case, it does feel that release is appropriate here because of the circumstances in this case.

**14.** Any further stay of petitioner's release pending appeal must be sought in the Fourth Circuit Court of Appeals.